General understanding of the law in this area, so we look forward to your assistance. I call first whoever is speaking for Electric Reliability. Good afternoon. May it please the court, my name is Jamil Alibi and I represent ERCOT. Just Energy's adversary proceeding challenges the rates set by Texas regulators during a once-in-a-generation winter storm. And Just Energy through that complaint seeks a different retroactive repricing for the energy that it purchased and used. Let me ask, does this case fit in with all the other litigation that has no doubt arisen from the same events? There are other pending cases, there's a case pending before the Texas Supreme Court that's going to resolve some issues. Are there other cases that will affect us or that we will affect? There are cases pending at the Texas Supreme Court regarding ERCOT's immunity. Those are the CPS and PANDA cases that are referenced in our brief. There are two cases pending before this court in addition to this one that arise from bankruptcy cases that were pending in the Southern District of Texas. That is the Brazos case which may be resolved in the coming weeks and a recently filed case. And a sell-a-hunt you mean, may be resolved? Planned confirmation, correct. And then there's the Entrast case where a petition for review was filed at this court last week. Do some of these have pretty much the same issues that we believe we're resolving? We believe that the issue in the CPS and PANDA cases about the immunity under state law for ERCOT would have an impact on factor number one under the Clark test for determining whether ERCOT has an arm of state Eleventh Amendment. I'm thinking about the filed rate doctrine, what's being said about extension, other matters. Are those in some of these other cases? There are MDL cases, multi-district litigation cases, pending in the state courts that have been consolidated where people have brought actions against ERCOT and other people. Some of those cases involve the filed rate which has been applied in the Texas state court cases. But this court's precedent in filed rate doctrine. I think it's clear also. Well, the issue here is does this complaint raise allegations, which is what TCE required, of a unfair or unlawful or high price? And there's no doubt that throughout the scores of pages that precede the causes of action, there are allegations about the rate being unlawful, the orders in which the prices were set in response to being unlawful, as well as too high. And in fact, the complaint goes into allegations explaining that the recovery that they seek, that Just Energy seeks, is the amount that would be the difference between what should have paid or what did pay. Maybe I'm getting a little bit ahead of you, but is it your position that this panel would have to consider the immunity issue first before abstention, or can we get to abstention without immunity? It's a jurisdictional question. We believe that under the U.S. Supreme Court's decision in SINOCHEM that this court, because it's addressing each of these issues without reaching the merits, can decide any one of the four issues, and that would resolve the entire appeal, whether it's Burford or whether it's filed rate or reaching immunity if it chose to do so. But certainly some of those issues are easier and don't involve waiting on the Texas Supreme Court or some other court or some other proceedings to play out before the other courts that are pending in the state courts. And so with respect to the filed rate, we believe that this court's precedent in TCE is binding. It's been well cited by other circuits. The South Branch case that we cite from the Seventh Circuit explained that this circuit joined many other circuits. It's a hundred-year-old established doctrine. And when we look at this particular complaint and the counts that are— Let me ask you about TCE. I want to make sure I get the initials right. It was not an action, such as here, that is against one of the entities intimately involved in setting the rate. It wasn't a private party's, and one of the parties was using the filed rate doctrine to defend itself against some argument about exorbitant rates. So that's one distinction. Another distinction, it seems to me, is something I don't see either side has much case law on, which is the argument that the process by which the rate was set was improper, so the protocols weren't followed. And that's not what this precedent TCE is about either, is it? So do you have any case law that really supports either part of that, that's more directly on point? Yes, Your Honor. The TCE case at the district court level did assert a cause of action against ERCOT, and specifically one for breach of the protocols with respect to the price. Oh, protocols, okay. Yes. And the district court dismissed, based on the filed rate doctrine, that issue was not appealed to this court. But even in the part that was appealed to this court against TXU, the issue was, was there actions that were taken that were improper that manipulated the rates? And that action was brought under an antitrust cause of action, federal and state. The South Branch case involved a RICO case, where they said you had bribed the house speaker in order to get the rates higher. And so the rate was at issue in those cases, and how the rate was arrived at, what was done to get to that rate, whether it was market manipulation, or conspiracy, or improper acts of any type, this court has found to be improper, and the courts that have applied KEO, the U.S. Supreme Court case, have all found that. Now with respect to your other question about the suit against ERCOT, there's the TCE district court case, most people don't sue ERCOT. But what the court said in TCE was, it has to be a regulated entity. And this is, ERCOT is a regulated entity. There's no dispute that it's subject to oversight, and under Texas Utility Code 39.151, it is subject to oversight of the PUCT, and is responsible to it. In addition, we would submit that with respect to ERCOT, it's the one that charged the rate here. It is the clearinghouse for all transactions in the Texas market. So it purchases power from one counterparty and sells to another. And so they are challenging the person that charged them the rate. And so it falls under the doctrine, falls within the scope of filed rate doctrine. With respect to the particular complaint here, paragraph 103 at record 2080, seeks an order declaring that these invoice obligations are void. The complaint explains that the invoice obligations are void because the invoices are based on the PUCT orders, which themselves are unlawful, and otherwise inconsistent with the ERCOT protocols and the SFA. That very idea that the price is too high because something wrong was done, whether it was breach of contract, whether it was antitrust, whether it was RICO, no court has allowed those allegations any time it raises the rate being too high or unfair or unlawful. Any one of those threes is a bar. Those rates are judicially unassailable. And more importantly here, it's not just the idea that ERCOT is a part of a regulated entity, which this court found to be a filed rate. These rates were set in response to PUCT orders. There is no doubt that the PUCT was exercising oversight and was intervening in a market during emergency conditions to try to save the state of Texas from going into a blackout. And the actions it took should not be subject to review by the courts, is the very concept behind the filed rate. Even in state court, isn't there a procedure that they can contest this, the filed rate, in state court? There can be actions to bring an ADR process with ERCOT, seek review by the PUCT, and then also review by the Travis County District Court or the Third Court of Appeals. Yeah, I understood your argument in the brief to be that the recourse was set forth as a statutory scheme, a state statutory scheme, not a bankruptcy scheme, and as far as the immunity is concerned, not in federal court. Would that be a correct understanding? That and one other point that's important about that, Your Honor, and that is on a market-wide basis, not a one-off. That's one of the non-discrimination principles of the filed rate doctrine, that one participant who decides to sue should not get a different rate than the rest of the market had to pay. And so that non-discrimination concept also comes into place with respect to the other two things that you said as well. And so with respect to the filed rate doctrine, the preference claims, the turnover claims— Counsel, I guess in connection with that last question, you are going to talk about abstention, which frankly for me is the most compelling argument that's made in this case. I'm happy to discuss abstention now. All right. With respect to the Burford abstention doctrine, we believe that this Court's Wilson case and opinion is very similar to the facts and circumstances of this case. In fact, Burford itself was a case involving the Texas Railroad Commission and its oversight over oil and gas. And with respect to the factors of Burford abstention, whether we look at Sierra Club or Wilson or Burford itself, all those same issues, the cause of action challenging state law here, the inquiry into unsettled issues of state law, does the PUCT have the right to intervene, can it do it by an order, how should it be done under the state procedure, the importance of the state interest, which in Wilson this Court said utility regulation was important, and the courts, as Judge Englehart just mentioned, have been set up for a special state forum to decide those issues. So the only issue that— It sounds to me like all the reasons abstention should apply in this case. That's exactly right. And what this Court has said is that if the requirements of Burford are met, abstention is mandatory. And the only, I think, argument that the Court has to consider at that point is has somehow 1334C, which is referencing permissive abstention, undone or by silence overruled Supreme Court judicial abstention doctrines. And they don't—Just Energy cites to no cases where somehow Congress has by its silence evidenced an intent to overrule Burford with respect to bankruptcy proceedings and specifically to Chapter 15 proceedings. And without that statement by Congress that it intended to do so, we don't believe that the 1334C bar with respect to permissive abstention—and I'll point out that the Wilson case, this Court said that it had jurisdiction to handle the appeal, and it would not have had jurisdiction under 1334D because this Court does not review permissive abstention from a bankruptcy court case. If we were to abstain, if we were to agree with you and abstain, would you agree that the bankruptcy court would still have jurisdiction over any recovered proceeds, recovered monies paid, or is it your position that the bankruptcy court should be completely out of this? I mean, there's an estate, a bankruptcy estate, albeit in Canada, subject to Canadian law, but wouldn't the bankruptcy court still be able to handle any proceeds due the estate? If at some point through the process that occurred through the state procedures there was some decision that needed to be effectuated, the bankruptcy court could do that potentially, subject to the other arguments we have about immunity and those issues, because we believe that that also should be dealt with in the state courts. These are entities that participate in a Texas regulated market. They can go to Texas state court to bring those actions, and I'll point out that, you know, at that point there'd be no race or anything to take control over with respect to a Chapter 15 ancillary proceeding, but it could be stayed or it could dismissed under an abstention doctrine. The other issue that I wanted to address was the indispensability of the PUCT, and I think that's an important one because under state law, which this court has said under Waylon v. Carter that it can look to to determine the necessity of a party, the PUCT by state statute under the government code has to be made a party to any action challenging the validity or the applicability of its orders, and both of those things are invalid, and also that they didn't apply to certain time periods. Whichever one it is, the PUCT should be allowed to have its say as to whether what it did was proper, and of course it has immunity, and that's not disputed that it has immunity, and so it can't be joined. I think that the court's decision in Lee v. Lawrence Anthony is quite compelling here. There, a licensor was sued, sorry, the licensee was sued, and they left the university out. This is the same thing that Just Energy is trying to do. It's trying to end run around not suing the state when it thinks that orders that were entered by the state of Texas during an important emergency situation should be challenged, but instead of suing the state of Texas or suing the agency that promulgated those orders, it sues the regulated entity. It sues ERCOT and tries to avoid the very thing that it should be doing, and that's exactly the court was faced with in the Lee case and said the party that actually owns the trademark has a better and bigger interest. Am I wrong? Was the commission at some point a party, PUCT? You're not wrong, Your Honor. The commission was a party, and the previous bankruptcy judge that was handling the case determined that because there was no cause of action asserted against it because it didn't have the money, it should be dismissed under the claims that existed at that time. The claims were amended a couple of times thereafter. We're on the second amendment complaint, but there's no doubt that there's still an order requested from the court regarding the invalidity of the invoice obligations based upon the invalidity of the PUCT orders. In fact, Judge Engelhardt sat on a panel where this court entered a stay of the proceeding when Just Energy wanted to proceed with summary judgment briefing as to the validity of the orders as the next step in this case, and that's what the scheduling order and the court was planning to do. That proceeding requires, as it is happening with respect to the Luminant and Exelon cases that are pending in the Travis County District Court and Appellate Courts, the PUC to be a party to those actions. ERCOT is not a party to those actions. It is the PUCT that is defending its authority to issue and so for all four reasons that we've discussed, or any one of them the court decides to choose first, whether it's Burford or whether it's the filed rate doctrine, the actions should be dismissed. Thank you, counsel. May it please the court. I'm here on behalf of market participants who rely on the PUC and ERCOT's exclusive regulatory authority under the filed rate doctrine to set market-wide electricity rates. Just Energy's attempt to collaterally assess the availability of electricity  and bankruptcy would undermine that exclusive regulatory authority and it would prejudice all other market participants who relied on the filed rate. It would also interfere with Texas's carefully calibrated regulatory scheme, which includes ongoing administrative and state court proceedings that will determine the appropriate market-wide relief, if any, that is related to under the filed rate doctrine, Burford abstention, or the other grounds discussed by ERCOT today. I'd like to turn to a few of the questions that your honor asked or your honors asked and just follow up a little bit. First of all, you asked about the pending cases and I think my colleague covered most of them. I just wanted to clarify one point that in addition to the Texas Supreme Court cases and the ERCOT administrative challenges to the invoices, which will ultimately be referred to the state court, there is also a pending case in the Third Court of Appeals in Austin that is discussed on page 13 of our brief. And in that case, market participants have asked the Third Court of Appeals precisely the same questions that Just Energy has asked the bankruptcy court, namely whether the PUC's orders violate the Texas Public Utility Regulatory Act and the Texas APA. We are awaiting that decision. It could come out any day. That doesn't affect the fact that this court should dismiss on the filed rate doctrine. It shows that that court is actively addressing the claims that Just Energy improperly seeks to bring in a bankruptcy adversary proceeding. Pending a Supreme Court is the issue of immunity. Is anything else pending at the Supreme Court of Texas? Any other resolution that they would make? No. I think the only other case could be this Court of Appeals case could eventually go to the Supreme Court. Judge Southwick, you mentioned potential distinctions with the TCE case. I would submit that those distinctions make our case for the filed rate doctrine's applicability even stronger. For example, you asked, well, ERCOT is not a market participant that is selling at the filed rate. Mr. Alibi correctly noted, we are actually the ones that sell the electricity. But if you think about ERCOT more as the regulator here, think about that. They're saying the regulator itself is not following the filed rate. That would be like suing FERC in federal district court and saying it didn't follow the filed rate. Of course, you do that through the agency itself and then on appeal in the appropriate judicial review proceedings. You also mentioned the fact that TCE was at least at the Court of Appeals level, not as much about the processes of setting the rates. Once again, that is the core of the filed rate. That's an APA claim, that the agency or ERCOT or PUC is not following its own procedures properly. It's not giving notice and comment or it's violating some organic act. Again, that would be like suing FERC in federal district court and saying you violated the APA. No, you go to FERC and you challenge their orders on judicial review. Otherwise, you're barred by the filed rate doctrine. And I would point out also, of course, Judge Jones in the Bankruptcy Court ultimately ruled against us on filed rate, but even he recognized that the filed rate doctrine applied in the Bankruptcy Court and that it applied to ERCOT in these rates here. He simply mistakenly thought that he could solve the filed rate doctrine just by striking the most egregious allegations from the complaint that expressly sought repricing. But the filed rate doctrine goes more broadly than that and prohibits attacks on the rates by virtue of their being unlawful, not merely that the court would ultimately have to reprice. Turning quickly and finally to Burford, this is a very strong case for Burford. We're cognizant that it is fairly unusual for this court to reverse a denial of abstention, but when you think about the fact that there are these multiple pending state court proceedings that address the very substantive arguments that Just Energy bases its claims on, and those will provide market-wide relief. Just Energy wants a discriminatory rate that only applies to them, and then they want our clients, the other market participants, to pay a greater than a filed rate when their clawback is socialized across the entire market. That's what we need, a market-wide solution from the agency and from any appropriate court. Thank you, Mr. Treat. Good afternoon. Please, the court. My name is James Teesey, and I'm appearing today on behalf of Just Energy. Ercott's appeal arises in the context of Chapter 15 bankruptcy cases, where a U.S. bankruptcy court is acting in an ancillary capacity to a foreign insolvency proceeding, and in the face of intent clearly expressed by Congress that the Supreme Court and that this court, in advancing a national bankruptcy policy, by localizing proceedings relating to foreign restructurings in a single federal court system. Ercott's primary challenge is the filed rate doctrine. The market in question is the Texas Nodal real-time energy market. In this market, the filed rate is the market-based rate arrived at in conformity with the procedures set forth in PUC to prove protocols that are the framework for the administration of this market. The doctrine is not applicable because Ercott failed to charge a filed rate that was arrived at in accordance with the protocols. Ercott did so by manipulating the price with adders to raise the rate above the market clearing price for energy and to oppose a real-time settlement point price of $9,000 per megawatt hour. And separately, even if the PUC orders that purported to sanction that departure from the established a filed rate, there is no basis to conclude that the doctrine bars Just Energy's challenge to the last 33 hours of the relevant period until February 19th. That sounds a bit like the paragraphs that were stricken by the bankruptcy court. I'm having trouble understanding how striking certain paragraphs are. It seems like you're either in or you're out. It's either all the paragraphs, which I think you've just alluded to, or none of them. I don't know how we get around a proceeding in bankruptcy court that doesn't delve into the things you've mentioned that seem to me, I could be wrong, seem to me touch upon the paragraphs that were stricken. The paragraphs that were stricken refer to a market rate. The only thing the bankruptcy court is going to do with respect to the filed rate, the only thing that it's going to do is to determine what the filed rate might have been, and it's only going to do that if Ercott raises an ordinary course of business defense. Meaning, well, at least with respect to the preference claims, under Canadian law, to prevail on our preference claims, we have to show that the company was insolvent, which the Canadian court has already found, that the payments were made within three months of the bankruptcy, which can't be disputed, and that Ercott was preferred over another creditor. We can recover on that claim then and there. We never touch on $9,000 APA or filed rate. If Ercott raises an ordinary course of business defense, the bankruptcy court may have to decide what the filed rate was, but the filed rate is the rate calculated in accordance with the PUCT-approved market-based protocols. And the argument really, Judge Graves, you asked about abstention. The argument on filed rate is really an abstention argument. Ercott's real argument is that they don't want a United States bankruptcy judge reviewing the protocols to determine what the filed rate might have been in the context of an ordinary course of business defense. Well, that makes it absent. I can understand that point of view, even if the judge wasn't right next to me. It does seem to me, getting back to what Mr. Street said, you really have state court version of an APA claim. You're saying that the agency didn't proceed according to the proper rules, probably not the four factors under the APA, but whatever else. But you're saying bankruptcy, you get some, you can work around that. We're not doing an en run around the... Work around is a dangerous phrase. I was wondering if you're going to adopt that with me, but keep going. We're a company that was forced to file for bankruptcy. When we come into bankruptcy, we earn certain rights under the bankruptcy code. And we can exercise those rights, and that's what we're doing. In terms of determining the APA, that's at best tangential. As PUCT admitted when it sought to dismiss itself from our bankruptcy case, we don't bring in an APA claim. And they concede as much. We don't seek declaratory relief under the APA. I mean, I don't want to overdo the APA angle, but you are claiming that the rates were improperly set. We are claiming that the, again, to the extent that there's an ordinary course rate, we're claiming that the rates had to be set in accordance with the protocols, and that the rates in question... Why am I wrong? I think maybe your response is, tell me why I'm wrong, I'm not picking up. Why isn't that an argument, that the rates were improperly set? The argument, well, I'll put it this way. It's not an argument that defeats our bankruptcy claim, because under 157B3 of the Title 28, we can consider State law in connection with our claims. But all the Court is going to do is to apply the filed rate calculated in accordance with the protocols. That doesn't offend the filed rate doctrine, because we're not changing the filed rate. Whatever the filed rate should have been, the Court will make that determination. The question is, should the bankruptcy court be the one to make that determination? And that is an abstention argument, and there is no abstention in a Chapter 15 case, period, full stop. That is very clearly articulated by Congress in 1334. Burford abstention has been subsumed, we cite on page 54 of our brief. Burford abstention has been subsumed into that statute. And Burford abstention is discretionary abstention, and so it's covered by 1334C1. And these orders, abstention doesn't apply, even if you were to consider that Burford abstention applied, it wouldn't apply in this particular case, because the orders are bespoke. There were 88 hours in duration. There's no comprehensive State policy here. We cite the public utility company of New Hampshire case on this issue. And in that case, Burford abstention was not appropriate when the State changed their entire regime from cost-based utility pricing to market-based utility pricing, which is exactly what the PURA did in 1999. That case, according to the First Circuit, relying on the Supreme Court of New Orleans, that case didn't give rise to Burford abstention. Wilson doesn't give rise to Burford abstention either. Wilson is a case that deals with what they said was a longstanding dispute between rural cooperatives and the Louisiana, basically the equivalent of the Louisiana PUCT. In 1970, between 1970 and 1978, they were regulated by the PUC, or their equivalent in Louisiana. In 1978, that rule was changed until 1989, and then the Louisiana Supreme Court issued the Cajun Power Decision, which then said that rural cooperatives weren't actually going to be regulated. And they bought a suit, and they tried to argue about whether they were going to retroactively reprice all those years. And the Court said that is a longstanding seesaw battle, but if they were only looking at the Louisiana decision in isolation, that would be the one-time affair that Burford abstention would not apply to. And so these PUCT orders are no different than that. The Court need not go beyond the four corners of them, just like the First Circuit  arguing that 1334C entirely precludes abstention. Absolutely, absolutely. I'd cite there is no permissive abstention in a Chapter 15 case. So I would begin with the firefighter's decision, which reads that very broadly. In 1334C, it reads it to say the text of 1334C only says except with respect to a case under Chapter 15. Firefighters reads that more broadly to say, quote, both the Chapter 15 case itself and those cases arising in or related to Chapter 15 cases are, there is no permissive abstention. And why is that? Because it goes through. There is a strong congressional policy in making sure that there is certainty that any proceedings in the United States that are being conducted like a Chapter 15 case in an ancillary capacity to a foreign court, that they are reposed in a single federal court system. And that is a very strong policy that exists that firefighters touched upon. It said from page 525 to 526, quote, the 2005 amendment to 1334C.1 is consistent with Chapter 15's emphasis on concentrating the resolution of cases involving foreign bankruptcies in one court system. And then it cites to the legislative history as well that says Chapter 15 is intended to be the exclusive door to ancillary assistance to foreign proceedings. The goal is to concentrate control of these questions in one court. So to the extent, again, the filed rate doctrine does not apply because all the court would do, if it did anything, is determine what the filed rate was. And the filed rate doctrine says that the filed rate is entitled to, it's assumed to be per se reasonable, and it's not entitled to judicial challenge. We're not challenging the filed rate. We're challenging a rate that is above the filed rate. And if the only thing that would happen is the court would determine what the filed rate is, the doctrine doesn't apply. And similarly, the TCE case observes on page 509, the TCE case does not help ERCOT. It observes that, quote, does not set or approve these rates. So it's one thing to say in a dispute between two private parties that because a rate is not physically filed, given that it's supervised by the PUCT, it's still part of the filed rate doctrine. That's what TCE says. It's another thing to say that given that there's PUCT supervision, even though the PUCT does not set rates, when it does set rates, those rates are entitled immediately to filed rate protection. When the PUCT has no authority to do that, when the PUCT supervision, which is supposedly what gives the PUCT the rate, a filed rate, when that supervision is not executed in conformity with the protocols, and alternatively, even if the court considers the PUCT supervision to be sufficient oversight, there's no argument for the final 33 hours. On the final 33 hours, the factual predicate relating to the PUCT orders expired by its own terms. Load shed was the reason why the PUCT orders had been entered initially. That was improper under the protocols. Load shed ceased at 11.55 p.m., and from and after that, for the last 33 hours, there's no PUCT supervision because the orders are not valid, and there's no filed rate because that rate was not set in conformity with the PUCT-approved protocols, which is what it had to be in order to be a filed rate. So, to that end, we're not seeking rate relief or to pay a lower rate. We're seeking only to pay the rate in accordance with the protocols, assuming, again, it becomes an issue as part of an ordinary course of business defense. We're also not arguing that there's a bankruptcy exception to the filed rate doctrine. In the Mirren, Ultra, and Gulfport cases, each examined what Ultra, on page 635, said aptly was a, quote, clash of two congressionally constructed titans, the FERC and bankruptcy courts. Congress has imbued each entity with significant wellspring of authority. That examined federal rate making. That examined the FERC's rate making. The state of Texas and Irkut are not congressionally constructed titans. A request that state rate making, bar bank, bar claims, asserted under the bankruptcy code, by a debtor, is less compelling, again, given the focus in Congress, the Supreme Court, and this court, and the firefighters, and the condor decisions in a uniform national bankruptcy policy, particularly when you're acting in an ancillary capacity to a foreign court. The bankruptcy code includes no special exception for state approved rates. And, again, that takes us to our final argument on filed rate, which is that it is really an abstention argument. They ask on five different places in their brief, Irkut and the PUC, 13, 14, 52, 59, and 60, 11, 12, and 22, that this proceed in Travis County State Court. But, again, the filed rate doctrine does not dictate where these disputes are heard. It's not a question of which jurisdiction. The filed rate doctrine says that a rate that is applied is given a presumption and is immune from judicial scrutiny if it's done in accordance with the protocols. The Ellis case that we cite is the Ninth Circuit case, which is the one that is factually analogous to where we are. In that particular case, SRP, which was the entity involved in unilateral, unsupervised rate setting, did not get the benefit of the filed rate doctrine. That case is on factual scores with this case, because the SRP, the utility in that case, was acting the same way that the PUC and Irkut were acting in this case. You can't regulate yourself and then get the benefit and the protection of the filed rate doctrine. And that's why we stress that it typically despise disputes between private parties. And if its purpose is to make rates per se reasonable and unassailable in judicial proceedings, that purpose is not served in a lawsuit against Irkut, the entity that makes the rules, alleging it didn't follow its own rules. Irkut cites to a series of statutes that purportedly provide cover and make whatever rate the PUC sets a filed rate, including 39.151D. All that statute says is that the Commission shall adopt and enforce the rules. That means they should enforce the protocols, but in this particular case, the protocols were not followed. That statute doesn't provide any assistance. They cite the Texas Administrative Code 25.501A, which says Irkut can determine market-clearing prices except as otherwise directed by the Commission. That statute applies to MCPE's market-clearing price for energy, the market rates, and it tells Irkut that consistent with the PURA and the statute entitled Wholesale Market Design for Irkut, that Irkut is to set up auctions to arrive at the market price of energy. That's not what happened here. There was a real-time deployment added. The price went up to 9,000. That statute doesn't provide any protection. So with regard to what is pending before the Supreme Court of Texas, do you agree that once the immunity question is answered with regard to Irkut, that that would resolve this litigation, at least insofar as claims against Irkut are concerned? It's a 12B1, right, that we have here, so... Right. If they determine that Irkut is a state, then no, because our view is that this court doesn't ever have to get to that issue at all. The whole dichotomy between whether Irkut is a state or not, the application of the five factors, this court never has to get to that. You can assume that Irkut is a state. The case law, again, because we're in a bankruptcy court, is unequivocally clear on this issue. The Supreme Court Katz decision says that, again, we can assume Irkut is a state, that states like Texas and others waived sovereign immunity in NREM proceedings and proceedings necessary to effectuate NREM jurisdiction of the bankruptcy courts. That includes orders on preference claims, which are the claims that we bring here, and it includes orders on turnover claims. Any claim that might otherwise have been asserted in proceedings necessary to effectuate NREM jurisdiction, Katz finds that there is no immunity if Irkut is a state in this case, and it can't even be disputed. All of our claims are core claims. Our bankruptcy claims, our Canadian preference claim, and our turnover claim, they arise in Title XI of the United States Code. They are statutory claims. And what's more, the Diaz case, which Irkut relies on, instructs that there are really three ways for states to be subject to jurisdiction and to waive immunity in a bankruptcy court. The first one is the so-called congressional abrogation issue, and that's Section 106 of the Bankruptcy Code. The second one is what they call ratification, waiver by ratification. That's the Katz line of cases from the Supreme Court that says if it's NREM or ancillary to NREM, which our preference and turnover counts clearly are, then a state waived its immunity when the bankruptcy clause was ratified at the Constitutional Convention. And the third is litigation waiver. And here you have Irkut, which appeared in the case, which supported the entry of recognition orders from the Canadian court, which authorized the company to borrow money to pay their invoices, and which was paid out of this bankruptcy court. That conduct gives rise to a waiver of an immunity defense either way. But again, the court does not have to reach the issue of whether or not Irkut is a state because the immunity question is settled so clearly by the Supreme Court that if it is a state, it is immune given the NREM claims that we've brought here. One other point on abstention. The Harrison case from this circuit discusses a few things about Burford. Number one, it confirms that Burford is discretionary. It confirms that Burford and abstention are disfavored. And that's the right answer because a federal court has an unflagging obligation to exercise jurisdiction, and exercising jurisdiction is the exception, not the rule. And here there are federal bankruptcy claims being brought in front of a federal judge, and they have an obligation to exercise jurisdiction over them. Burford doesn't fit well into Chapter 15. Again, this is a chapter of the Bankruptcy Code that Congress decided in 1334 that only one court system, the federal court system, should be relevant when acting in an ancillary capacity to a foreign proceeding, and the interest in centralizing disputes relating to foreign restructurings in the federal court system predominates over state law concerns. What is your response to the argument, regardless if it's in terms of abstention or something else, that to allow this case, this single case, this single just energy party to proceed in bankruptcy court will distort the overall resolution of the system-wide problems that existed as a result of the bankruptcy case, and that's the wrong way to be resolving these claims? We, the advantage we gain is we're in bankruptcy, which could be debated as to whether that's an advantage, but we gain the advantage of having these claims, and whatever precedent comes down from this Court relates to a company that is in Chapter 15 and is bringing avoidance, in-rem, preference, and turnover claims in connection with a foreign restructuring. So what I'm hearing is it don't matter, that you have the right to do this, and there you are. We have a right to do it, and we do. There's a lot of problems with being associated with being forced to file for bankruptcy, which is what we did. I think it was mentioned that we were trying to get an end-run around the Texas procedures. We were forced into bankruptcy. We were forced to file for bankruptcy protection. We're not end-running around the case. We are here because we were forced into this predicament, and these happen to be rights that we get, not everyone, to the floodgates argument, I believe, right, that there will be a wave of federal judicial scrutiny now. Only companies that are in bankruptcy in Chapter 15, because you have the benefit of 1334C, which is a very powerful statute that applies in Chapter 15, only companies in this predicament are the ones, and bringing turnover, preference, claims that are in-rem or ancillary to in-rem, only those companies bringing those types of claims will be affected by the decision if you were to rule in our favor. It's narrow in its scope, and it doesn't go beyond that. And also on abstention, I would say this. The Harrison Court notes that in order to—Harrison is a Medicaid recipient who brings a 1983 action, a federal claim, because there's a cap on what the state of Texas will pay, and the Court says no Burford abstention here. First of all, it's a federal claim. We bring federal claims. Our claims are Bankruptcy Code claims. And under the Bankruptcy Code, even if they consult Canadian law, and even if they consult state law, the APA—we're not bringing an APA claim, but even if they consult state law, under the Bankruptcy Code, it's still a federal claim, even if a bankruptcy court incident to deciding it looks at state law. Federal claim in Harrison. Harrison also says the exercise of jurisdiction has to cause the administration to crumble or risk recurring and confusing federal intervention in an ongoing state scheme. We're not going to do that. We're looking at two orders of limited duration. And lastly, there has to be an alternative forum. Another point for Harrison. We have no alternative forum. The PUCT and ERCOT have asked us and insisted that we go to Travis County, Texas. The Travis County State Court cannot decide our claims. Under 1334, the Federal Bankruptcy Court has exclusive jurisdiction over our claims. Those state courts can't decide our— The bankruptcy court is without authority to lift a stay and allow a state court proceeding to go forward. There is no authority for the Federal Bankruptcy Court to do that. Is that what you're saying? I'm saying that there is no authority for the Travis County State Court to decide our bankruptcy claims. They can't—our federal court has exclusive jurisdiction over our bankruptcy claims under 1334C. They can't decide—Travis County can't decide a Canadian preference claim. Travis County can't decide a turnover claim. Only a federal court can decide that. Again, a right conferred on a company that's in bankruptcy to have its disputes heard before the same court that's supervising its restructuring. I understood the preference claim—and we talked about this earlier—to be different. Correct me if I'm wrong. You have two claims. One, that you paid—your client paid sums under protest that were not due or that are the result of some type of—for lack of a better word—some type of tortious conduct or improper conduct in the administration of the energy supply during the storm. All right? Then you have a voidable preference claim, which is exclusively a bankruptcy claim that, well, if we did owe it, if it's decided that it was due, these amounts were due, we paid them under protest and they should be brought back in simply because of the dates—and you made a point of saying these are indisputable facts—simply because of the date. Isn't that in the alternative? The initial claim has nothing—the fact that we paid under protest, we did to reserve our rights because we were paying them, okay? We've already lost one count because of that. The fraudulent transfer count. The judge—the court said, you can't tell me that I paid you to save my company but that I didn't—that that was—I can get that back now as an intentional fraudulent transfer because under Canadian law, they have to be insolvent and if you're done with the intent to hinder and delay and defraud. And the judge said, you paid them under protest. And the only part after that the protest becomes relevant is that we reserved our rights. But otherwise, the claim is just if we're insolvent and it's done within three months. Then the money comes back to us. The protest is irrelevant. We get it back. That's what I'm saying. I understood you to be asserting two claims. One, we paid that which was not due. Second is the turnover count. So we want the money back because we shouldn't have paid it in the first place. If that doesn't hold any water, then we paid it as a voidable preference. We paid it because it was due and it's unquestionably due. But now we want it back because we paid it within the time limit that allows it to be voidable. Judge Englert, that's the right of every company in bankruptcy to claw back money that's paid in preference. Even if it's paid in accordance to the contract, even if it's due, if it's paid in preference to another creditor, the redistributive provisions of the code—in this case, Canada has the same thing—claws that money back in for all other creditors. That's a power that you get regardless of whether or not— I understand. I understand. I'm trying to make a distinction between what I thought were the two different claims you made. The other claim is the turnover count. That's 542, okay? The basis of that is that, yes, the invoices were illegal, but 542, that power, that turnover power is like the preference. It's a power that's given to a bankrupt company to bring back money into the estate. And it's not just a breach of contract claim. It's actually a turnover, whether that's our property, it's located within the And we have the right under the Bankruptcy Code to bring that money back in, a right that only we get. All right, counsel. Thank you. Thank you very much. What this Court has heard is that there's an entity in the Texas regulatory market that applies only to it and to ignore all the proceedings that are occurring in state court that will decide these issues on a market-wide basis. And it seeks to do so under the guise of a Chapter 15 ancillary proceeding asserting foreign law causes of action. There is no basis in any of this Court's precedent that would allow an entity to use even a bankruptcy claim to reject or to challenge a filed rate based upon any such allegation of it being too high or unfair or illegal. When faced with that issue in Merritt, Ultra, and the progeny thereafter, this Court said that a debtor had the ability to reject a contract regarding the purchase of future quantities that it had never purchased and would not need. But if it did so on the basis that the rate was too high, it would be barred by the filed rate doctrine. Here, these entities go further. They seek retroactive repricing of the amounts of energy that they've purchased, used, and paid for, and now seek to receive that difference of amount back. What counsel just told the Court was, the bankruptcy Court is going to determine what the filed rate is. That very concept of judicial repricing is barred by a United States Supreme Court decision in Keogh, and this Court's decision is applying it. And they try to make it seem like it's somehow allowed under a preference claim. But looking at the record and their own allegations, they say in paragraph 11 at record 2047, plaintiffs challenge the invoice obligation because, among other things, the invoices are based on the PUCT orders, which themselves are unlawful under the APA and PURA. There are statutory challenges being made and embedded into that preference claim. In addition, the question that this Court said was important in In re Medco was, do the claims implicate the party's rights and liabilities under that rate? There is no dispute here that there is claims that implicate the party's rights and liabilities under the rate that was charged. They believe and seek a declaration that the rate that was charged was unlawful, and the invoices that were submitted were unlawful because of that. They try to change what the rate is. But that was exactly the allegation in TCE. They said the market had been manipulated and the rate was something different. The filed rate would have been lower. Same thing in South Branch. Every plaintiff says that I would have gotten a different rate. And for that reason, the filed rate doctrine applies whether it's a Chapter 11 proceeding as in Merritt and Ultra, whether it's a Chapter 15 proceeding as this one, or any district court proceeding on the Supreme Court's decision under Keogh. Tell me the significance, which is only alluded to, I think, in the briefs, of what happened at 1155 on the night of February 17 and the continuation of the higher rate thereafter. What's the significance of that in the filed rate issue? The significance of that is that what is known as residential load shed, the blackouts of the residences had stopped. And so there's a dispute as to whether the PUCT orders continue to apply because there was still what is known as industrial load shed. Large corporations and companies that use a lot of electricity were told to stay off the Texas grid so the residences could get their power back. The significance under this court's decision in TCE is not at all. The fact that the PUCT orders applied, whether it's to 55 hours or 88 hours, only bolsters the application of the filed rate doctrine. But the filed rate doctrine applies— When did a new rate get filed after 1155 on that night? Friday morning at 9.05. I don't know what Friday is versus February 17 or whatever. The next day? The 19th, two days later, about 33 hours later. Does that mean there was no filed rate or the filed rate was still— Filed rate stayed at 9,000, Your Honor, until it dropped the morning after when the grid was put back to a resolution where it was safe to go forward in the state of Texas. Counsel, I know your time's running out. Would you care to respond? Counsel was pretty adamant that Section 1334C would preclude abstention in this case. What's your best case to the contrary? And by the way, you have whatever time you need to answer the question. Thank you, Your Honor. I think the best case that I would cite on that concept is that under the Supreme Court discourse precedent, Congress has to speak to overrule something. And what they're suggesting is that by saying permissive abstention, which is a much broader doctrine, the concept is that bankruptcy courts can, under a doctrine of comedy to state law, decide not to address those issues and they can abstain. And so Congress said, in these Chapter 15 proceedings, we don't want you to do that. But nowhere has Congress said that Younger and Colorado River and Burford have somehow ceased to exist when they apply. And so we believe that with respect to this Court's decision in Sierra Club, that's a doctrine that it requires mandatory abstention when its factors are met. It's not a permissive abstention doctrine. And so the very fact that 1334C speaks to permissive abstention, whereas Burford is a mandatory abstention doctrine, does not reconcile either, despite Congress's lack of intent to do so. Thank you. Thank you, Counsel. Counsel for all parties here. No doubt you had much more you could have told us, but the case is under advisement. We are in recess. Thank you.